**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| TIMOTHY BARKER, | : |
| Plaintiff, | : **COMPLAINT** |
| v. | : **DEMAND FOR JURY TRIAL** |
| THE BANK OF NEW YORK MELLON CORP., | : |
| Defendant. | : |

---

Plaintiff Timothy Barker ("Mr. Barker" or "Plaintiff"), by and through his attorneys, Outten & Golden LLP, brings this action against Defendant The Bank of New York Mellon Corp. ("BNY" or "Defendant") and hereby alleges and complains as follows.

**NATURE OF THE ACTION**

1. Plaintiff brings this action against BNY to remedy discrimination on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et. seq. ("ADEA"), the New York State Human Rights Law, N.Y. Exec. L. § 290, et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. L. § 8-101, et. seq. ("NYCHRL").

2. Mr. Barker, who is sixty-seven years old, was a Managing Director and Family Wealth Investment Advisor ("FWIA") at BNY for more than twelve years. A stellar performer, he often ranked at or near the top of all FWIAs nationwide as to a number of performance metrics and serviced some of BNY's largest and most complex clients. As described below, despite his years of excellent performance and dedicated service, when Mr. Barker was sixty-five – and after one of his supervisors began making ageist comments about another employee in his mid-sixties – BNY began treating Mr. Barker differently, and worse, than much younger FWIAs,

and then downgraded Mr. Barker's performance rating, denied him an annual bonus, and terminated his employment because of his age.

3.      Mr. Barker seeks declaratory and injunctive relief, consequential, compensatory, punitive, and liquidated damages, interest, reasonable attorneys' fees and costs, and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Mr. Barker's ADEA claims, pursuant to 28 U.S.C. § 1331 because the ADEA claim arises out of a statute of the United States.

5.      This Court has supplemental jurisdiction over Mr. Barker's claims under the NYSHRL and NYCHRL, pursuant to 28 U.S.C. § 1367(a), because these claims are so closely related to his ADEA claim that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), because the Defendant resides in this District, and because a substantial part of the events giving rise to Mr. Barker's claims occurred in this District.

7.      On July 21, 2023, Mr. Barker filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that BNY discriminated against him on the basis of age, and the Charge was cross-filed with the New York State Division of Human Rights.  On July 17, 2024, Mr. Barker received a finding of reasonable cause and Notice of Right to Sue from the EEOC.

## **THE PARTIES**

8. Mr. Barker is sixty-seven years old.

9. At all relevant times, Plaintiff was an "employee," within the meaning of ADEA, the NYSHRL, and the NYCHRL. At all relevant times, Plaintiff was employed by BNY in New York, New York.

10. Defendant BNY is a Delaware corporation with a principal place of business at 240 Greenwich Street, New York, New York.

11. At all relevant periods, BNY had more than twenty (20) employees.

12. During all relevant time-periods, BNY was Mr. Barker's employer within the meaning of the ADEA, the NYSHRL, and the NYCHRL.

## **FACTUAL ALLEGATIONS**

### **Background**

13. Mr. Barker is a seasoned and talented investment professional and attorney who has spent more than forty years providing tax, financial planning, and investment advice to high-net-worth individuals and families.

14. Before Mr. Barker joined BNY, he had amassed almost thirty years of experience as a senior investment adviser at major financial institutions such as US Trust Company, First Republic Bank, and Ayco/Goldman Sachs.

15. In December 2011, Mr. Barker joined BNY as a Managing Director and FWIA. He worked in BNY's New York Tri-State Region and was responsible for analyzing and providing asset allocation and portfolio recommendations to individual, family, endowment, and charitable trust clients with more than $20 million in assets under management, including some

of BNY's largest and most complex clients. He also was a member of BNY's Private Equity Investment Committee and Regional Investment Committee.

16. FWIAs were assigned to work in various regions across the country. When Mr. Barker joined BNY, all of the FWIAs, regardless of assigned region, reported to BNY's Head of Advice, Planning, and Fiduciary Services ("Head of Advice") and were evaluated according to FWIA-specific goals set by the Head of Advice.

17. In or around 2017 or 2018, the reporting structure changed, with each FWIA reporting on a dotted-line basis to the Head of Advice and reporting directly to the Regional President of their assigned region, respectively. The change to a dual reporting structure, however, did not modify BNY's method of evaluating FWIA performance. Each FWIA was still evaluated according to FWIA-specific goals set by the Head of Advice and was assessed relative to the performance of other FWIAs.

18. Mr. Barker's performance was excellent. Of the eight FWIAs nationwide, Mr. Barker consistently ranked at or near the top in a number of categories, including relationship assets under management, relationship assets under custody, annual client revenue, and annual new asset net inflows.

19. Mr. Barker also consistently exceeded client retention goals and new business team participation revenue and asset goals and frequently spoke at wealth management conferences and events attended by BNY clients, advisors, and other business partners of BNY.

20. In recognition of Mr. Barker's strong performance, he consistently garnered annual performance ratings of "exceeded" or "met" (or "achieved") expectations and was consistently awarded significant annual incentive compensation.

**BNY Discriminates against Mr. Barker Because of His Age.**

21. In or around March 2021, Mr. Barker started reporting to John Ippolito, who had then assumed the role of New York Tri-State Regional President. (Mr. Barker continued to report to the Head of Advice on a dotted-line basis.)

22. Within months of Mr. Ippolito's assuming the role, Mr. Ippolito began revealing an ageist bias. For instance, on several occasions from in or around the summer 2021 to the end of 2022, Mr. Ippolito referred to another of his direct reports, a sixty-seven year old Wealth Strategist ("the Wealth Strategist"), as a "white-haired guy trying to look young." In addition, upon information and belief, in management meetings, Mr. Ippolito also referred to the Wealth Strategist as "old" (as well as "confused" and "befuddled," even though the Wealth Strategist was neither).

23. Mr. Barker was concerned about Mr. Ippolito's ageist remarks as he (Mr. Barker) was the oldest of the FWIAs nationwide and close in age to the Wealth Strategist. While there was an FWIA who was approximately one year younger than Mr. Barker ("the NY FWIA") (who also reported to Mr. Ippolito), the other FWIAs were in their forties and fifties.

24. Mr. Barker, however, remained focused on his work and continued to turn in a strong performance. At his mid-year review in June 2022, he was rated as "On-Track" to meet his performance goals for 2022.

25. But, just a few months later, BNY began treating Mr. Barker, who was sixty-five, disparately compared to much younger FWIAs.

26. For instance, in or around October or November 2022, Mr. Barker learned that Mr. Ippolito had surreptitiously instructed BNY sales personnel not to include Mr. Barker or the NY FWIA in pitch meetings with new and prospective clients without Mr. Ippolito's approval,

5

even though Mr. Barker and the NY FWIA had previously regularly participated in such meetings. Indeed, BNY's standard practice was to include FWIAs in pitch meeting with clients or potential clients with $20 million or more in assets.

27. Meanwhile, upon information and belief, BNY continued to allow much younger FWIAs to participate in such pitch meetings. BNY did not inform Mr. Barker of the decision to exclude him from pitch meetings, let alone provide any rationale for singling him (and the NY FWIA) out with respect to these meetings. By excluding Mr. Barker from these meetings, BNY denied him opportunities to generate additional new business revenue and client relationships.

28. At the end of 2022, BNY refused to provide Mr. Barker with his annual review for 2022. BNY did not provide Mr. Barker with any rationale for this decision. Upon information and belief, BNY provided substantially younger FWIAs with their annual reviews for 2022 at or around that time.

29. BNY also refused to provide the NY FWIA with his annual review for 2022. Upon information and belief, Mr. Barker and the NY FWIA were the only two FWIAs who were not given annual reviews for 2022.

30. BNY also refused to provide an annual review for 2022 to the Wealth Strategist. Thus, Mr. Ippolito's three oldest direct reports (Mr. Barker, the NY FWIA, and the Wealth Strategist, all of whom were in or around their mid-sixties) were denied year-end reviews for 2022. BNY, however, provided year-end reviews for 2022 to much younger direct reports of Mr. Ippolito.

31. Despite this disparate treatment, for 2022, Mr. Barker met the annual goals that had been set for him earlier in the year and ranked at or near the top of all FWIAs with respect to

new business participation revenue, client revenue, client assets under management, and client assets under custody.

32.     Additionally, Mr. Barker worked on teams that serviced the New York Tri-State Region's largest clients, that attracted the New York Tri-State Region's largest new business win, and that serviced clients with aggregate assets under management in excess of $5 billion, which was the largest client portfolio of any of the FWIAs nationwide.

33.     Despite Mr. Barker's excellent performance, on January 17, 2023, BNY terminated Mr. Barker's employment, effective January 30, 2023.

34.     Although BNY told Mr. Barker that his role was being eliminated, that rationale is baseless.

35.     BNY retained five other FWIAs, including FWIAs who were substantially younger than Mr. Barker and who were equally and/or less qualified than Mr. Barker.

36.     Upon information and belief, BNY terminated Mr. Barker's employment because of his age.

37.     Upon information and belief, BNY's age-based termination of Mr. Barker was part of a broader pattern of age discrimination. For instance, in terms of the FWIAs, that same day, BNY also terminated the employment of the NY FWIA, i.e., two of the three FWIAs who were terminated on January 17, 2023 were the oldest FWIAs.

38.     In terms of the New York Tri-State Region, BNY also terminated the Wealth Strategist's employment on January 17, 2023. Thus, three of the four employees in the New York Tri-State Region who were terminated on January 17, 2023 (Mr. Barker, the NY FWIA, and the Wealth Strategist) were the oldest of Mr. Ippolito's direct reports, were all in or around their mid-sixties, and were substantially older than direct reports of Mr. Ippolito's who were

retained. (The fourth employee in the New York Tri-State Region who was terminated on January 17, 2024 was a direct report of Mr. Ippolito and was in her mid-fifties.)

39. Moreover, that same day, BNY announced in the press that it had laid off approximately 1500 workers, but planned to "invest in areas that include 'early-in-career talent' and that it expects to ramp up its recruiting on college campus this year," further demonstrating BNY's age-based plan to excise older workers in favor of bringing on younger ones.

40. In addition to terminating Mr. Barker's employment, BNY also downgraded Mr. Barker's performance rating and denied him an annual bonus for 2022.

41. Specifically, although BNY had refused to provide Mr. Barker with an annual performance review at the end of 2022, on February 15, 2023, Mr. Ippolito suddenly told Mr. Barker that BNY was rating his performance for 2022 as "partially met expectations" and denying him annual bonus compensation for 2022 due to Mr. Barker's failure to meet a metric called the "self-sourced asset target" (or the "self-sourced new business target").

42. BNY, however, gave performance ratings of "met" or "exceeded" expectations and awarded incentive compensation to FWIAs who were substantially younger than Mr. Barker and who had not met their "self-sourced asset target metrics."

43. Moreover, BNY did not use the self-sourced asset target metric to measure FWIA performance for annual review and compensation purposes. BNY had even told Mr. Barker and other FWIAs in or around the 4th quarter of 2021 that it would not use the "self-sourced asset target" metric for annual performance and bonus purposes.

44. This was the first time in Mr. Barker's tenure that he had been rated in an annual review as anything less than "meets" or "exceeds" expectations and the first time in his tenure that he was denied annual incentive compensation. In June 2022, BNY had acknowledged that

8

Mr. Barker was "On-Track" to meet his goals for 2022 as well, and, as of the end of the year, Mr. Barker met those goals, as described above.

45. At no point after June 2022 did BNY inform Mr. Barker, orally or in writing, that his performance was deficient, either with respect to the "self-sourced asset target" or otherwise, as would have been required at BNY had Mr. Barker actually failed or been in danger of failing to meet his applicable goals.

46. Upon information and belief, BNY rated Mr. Barker as "partially met expectations" and denied him an annual bonus for 2022 because of his age. BNY's after-the-fact rationale for taking these actions is baseless.

47. Upon information and belief, BNY's proffered rationales for terminating Mr. Barker's employment, rating him as "partially met expectations" for 2022, denying him an annual bonus for 2022, and subjecting him to the other adverse and/or harmful acts described above, are pretextual.

48. Upon information and belief, BNY, by the actions described above, discriminated against Mr. Barker because of his age in violation of the ADA, NYSHRL, and NYCHRL. As a result of Defendant's unlawful conduct, Mr. Barker has suffered, and continues to suffer, irreparable injury, monetary damages and other damages, including, without limited, pain and suffering, emotional distress, humiliation, and mental anguish.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Age Discrimination in Violation of the ADEA**

49. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

50. Upon information and belief, Defendant violated the ADEA by discriminating against Plaintiff in the terms and conditions of his employment because of his age.

9

51. Upon information and belief, BNY treated Plaintiff disparately, terminated Plaintiff's employment, denied Plaintiff an annual bonus, downgraded Plaintiff's performance rating, and took the other harmful and/or adverse actions described above because of Plaintiff's age.

52. Upon information and belief, Defendant's violations of the ADEA were willful, within the meaning of 29 U.S.C. § 626(b).

53. As a result of Defendant's unlawful acts, Plaintiff is entitled to damages, including, without limitation, past and future lost compensation and benefits, liquidated damages, reasonable attorneys' fees and costs, and pre-judgment interest.

54. No previous application has been made for the relief requested herein.

## AS AND FOR A SECOND CAUSE OF ACTION

### Discrimination on the Basis of Age in Violation of New York State Human Rights Law (N.Y. Exec. L. § 290, et seq.)

55. Plaintiff realleges and incorporates all allegations in the preceding paragraphs.

56. Upon information and belief, Defendant violated the NYSHRL by discriminating against Plaintiff in the terms and conditions of his employment because of his age.

57. Defendant treated Plaintiff disparately, terminated Plaintiff's employment, denied Plaintiff an annual bonus, downgraded Plaintiff's performance rating, and took the other harmful and/or adverse actions described above, treated him less well, and/or subjected him to inferior terms, conditions, and/or privileges of employment, on the basis of Plaintiff's age.

58. Defendant showed willful, wanton, and/or reckless disregard for Plaintiff's statutory rights and knew or reasonably should have known that its actions constituted unlawful discrimination.

59. As a result of Defendant's unlawful acts, Plaintiff is entitled to damages, including but not limited, to past and future lost compensation and benefits, damages to compensate for past and future physical and/or emotional distress, punitive damages, reasonable attorneys' fees and costs, and pre-judgment interest.

60. No previous application has been made for the relief requested herein.

## AS AND FOR A THIRD CAUSE OF ACTION

### Discrimination on the Basis of Age in Violation of the New York City Human Rights Law (N.Y.C. Admin. Code § 8-107, et. seq.)

61. Plaintiff realleges and incorporates by reference allegations in the preceding paragraphs.

62. Upon information and belief, Defendant violated the NYCHRL by discriminating against Plaintiff in the terms and conditions of his employment and/or treating him less well on the basis of his age.

63. Upon information and belief, Defendant terminated Plaintiff's employment, downgraded Plaintiff's performance rating, denied him an annual bonus, and otherwise subjected him to the harmful and/or adverse acts described above and/or treated him less well, on the basis of Plaintiff's age.

64. Upon information and belief, Defendant knew or reasonably should have known that its actions constituted unlawful discrimination and showed willful, wanton, and/or reckless disregard for Plaintiff's statutory rights.

65. As a result of Defendant's unlawful acts, Plaintiff is entitled to damages, including, but not limited to, past and future lost compensation and benefits, damages to compensate for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs, and pre-judgement interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A declaration that the acts, practices, and omissions complained of herein are unlawful and violate the ADEA, the NYSHRL, and the NYCHRL;

B. Enjoining and permanently restraining the statutory violations alleged herein, and directing that Defendant take such affirmative action as is necessary to ensure that the effects of its unlawful employment practices are eliminated;

C. Awarding Plaintiff damages and relief to restore Plaintiff to the position he would have occupied but for Defendant's discriminatory conduct and to make Plaintiff whole for all earnings and benefits that he would have received but for that discrimination, including, but not limited to, wages, bonuses, restricted stock units, pension and retirement contributions, health care coverage, and all other lost compensation and benefits, as well as for all losses and/or damages that he incurs as a result of Defendant's unlawful discrimination;

D. Awarding Plaintiff liquidated damages for Defendant's willful acts of discrimination, pursuant to the ADEA, 29 U.S.C. § 626(b);

E. Awarding Plaintiff compensatory damages, including, but not limited to, damages for humiliation, damage to reputation, and mental anguish, and punitive damages, for Defendant's violations of NYSHRL and the NYCHRL;

F. Awarding Plaintiff pre-judgment interest at the statutory rate of 9%;

G. Awarding Plaintiff reasonable attorneys' fees and costs, pursuant to the ADEA, NYSHRL, and the NYCHRL; and

H. Awarding such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: New York, New York
September 23, 2024

                                                  Respectfully submitted,
                                                  OUTTEN & GOLDEN LLP
                                                  *Attorneys for Plaintiff*

By:    /s/ *Amy F. Shulman*
           Amy F. Shulman
           Eliana Theodorou
           685 Third Avenue
           25th Floor
           New York, NY 10017
           Telephone: (212) 245-1000
           Facsimile: (646) 509-2071