UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                           :
TIMOTHY BARKER,                                            :
                                                           :
                              Plaintiff,                   :
                                                           :
              -v-                                          :            24 Civ. 7189 (JPC)
                                                           :
THE BANK OF NEW YORK MELLON CORP.,                        :            OPINION AND ORDER
                                                           :
                              Defendant.                   :
                                                           :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Before the Court are three motions from Plaintiff Timothy Barker to compel Defendant

The Bank of New York Mellon Corp. to produce various categories of documents and information.

Dkts. 40 ("First Motion"), 50 ("Second Motion"), 53 ("Third Motion").  For the reasons that

follow, Plaintiff's First and Third Motions are granted in full; his Second Motion is granted in part

and denied in part.

## I. Background[1]

Plaintiff, who was sixty-seven years old when his Complaint was filed on September 23,

2024, was employed by Defendant from December 2011 to January 2023.  Compl. ¶¶ 2, 15, 33;

Dkt. 12 ("Answer") ¶¶ 2, 15, 33.  He served as one of eight Family Wealth Investment Advisors

("FWIAs") nationwide, assigned to Defendant's New York Tri-State Region.  Compl. ¶¶ 2, 15,

18.  When Plaintiff joined Defendant, all the FWIAs, regardless of assigned region, reported to

Defendant's Head of Advice, Planning, and Fiduciary Services ("Head of Advice"), who set

FWIA-specific goals and evaluated FWIAs according to those goals.  Id. ¶ 16; Answer ¶ 16.  But

---

[1] The facts set forth herein are based on the allegations in Plaintiff's Complaint, see Dkt. 1
("Compl."), and, unless otherwise indicated, have not been admitted by Defendant.

starting in 2017 or 2018, the FWIA reporting structure changed:  FWIAs now reported only on a dotted-line basis to the Head of Advice and instead reported directly to the Regional President of their assigned region.   Compl. ¶ 17; Answer ¶ 17.   Importantly, however, FWIAs were still assessed relative to each other's performance based on FWIA-specific goals set by the Head of Advice, notwithstanding the new involvement of the Regional Presidents.  Compl. ¶ 17 ("The change to a dual reporting structure . . . did not modify [Defendant's] method of evaluating FWIA performance."); Answer ¶ 17.

Thus, by 2021, Plaintiff reported to the Head of Advice on a dotted-line basis and reported directly to the New York Tri-State Regional President, John Ippolito.  Compl. ¶ 21; Answer ¶ 21. Ippolito, Plaintiff alleges, made several comments from 2021 through 2022 "revealing an ageist bias." Compl. ¶¶ 22-23.  And by the fall of 2022, Defendant "began treating" Plaintiff—who until then had received high performance reviews, *see id.* ¶¶ 18-20, 24—"disparately compared to much younger FWIAs." *Id.* ¶ 25.

Around October or November 2022, Plaintiff learned that Ippolito had instructed sales personnel not to include him and another similarly aged FWIA (the "NY FWIA") in client pitch meetings without Ippolito's approval, even though the younger FWIAs were allowed to participate in such meetings.  *Id.* ¶¶ 23, 26-27.  At the end of 2022, Plaintiff and the NY FWIA were not provided with annual reviews, while Defendant conducted year-end reviews for the younger FWIAs. *Id.* ¶¶ 28-29.  And on January 17, 2023, Defendant terminated three of the eight FWIAs, with two of those three being Plaintiff and the NY FWIA.  *Id.* ¶¶ 33-37.  That same day, another employee of the New York Tri-State Region who was similarly aged to Plaintiff was terminated too, *id.* ¶¶ 22, 38, meaning that "three of the four employees in the New York Tri-State Region who were terminated on January 17, 2023 . . . were the oldest of [] Ippolito's direct reports, were all in or around their mid-sixties, and were substantially older than direct reports of [] Ippolito's

2

who were retained," *id.* ¶ 38.  These terminations, Defendant announced, were part of a 1500-worker reduction in force ("RIF"), and took place at the same time Defendant declared its intent to "invest in areas that include 'early-in-career talent.'"  *Id.* ¶ 39; *see* Answer ¶ 33 (admitting that "Plaintiff's role was eliminated effective January 30, 2023 as part of a reduction in force"). Finally, despite not giving Plaintiff a 2022 performance review, Defendant "downgraded" Plaintiff's performance rating and denied him an annual bonus for 2022, purportedly because he failed to meet one metric—the "self-sourced asset target" metric—even though younger FWIAs who had also failed to meet that metric received higher performance ratings and bonuses.  Compl. ¶¶ 40-47.

Plaintiff filed suit on September 23, 2024, claiming age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*  Compl. ¶¶ 1, 49-65.  According to the Complaint, Defendant "treated Plaintiff disparately, terminated Plaintiff's employment, denied Plaintiff an annual bonus, downgraded Plaintiff's performance rating, and took the other harmful and/or adverse actions described [in the Complaint] because of Plaintiff's age."  *Id.* ¶ 51 (ADEA claim); *accord id.* ¶¶ 57 (NYSHRL claim), 63 (NYCHRL claim).

On November 15, 2024, Defendant filed its Answer, admitting that even after the "change to a dual reporting structure," "[e]ach FWIA was still evaluated according to FWIA-specific goals set by the Head of Advice and was assessed relative to the performance of other FWIAs" and Plaintiff "continued to report to the Head of Advice on a dotted-line basis."  *Id.* ¶¶ 17, 21; Answer ¶¶ 17, 21.  Defendant, however, denies Plaintiff's allegation that he had "the largest client portfolio of any of the FWIAs nationwide," Compl. ¶ 32, instead "aver[ring] that Plaintiff was responsible for Defendant's loss of a total of eighteen client relationships," Answer ¶ 32.

3

After the parties suggested there were multiple discovery disputes to be resolved, *see* Dkt. 38, Plaintiff filed his first motion to compel on January 31, 2026, Dkt. 40. Defendant responded to the First Motion on February 4, 2026. Dkt. 41 ("Opposition to First Motion"). After the Court granted Plaintiff's request to file a reply to Defendant's opposition, Dkts. 42, 44, Plaintiff filed his reply on February 19, 2026, Dkt. 45 ("First Motion Reply"). Plaintiff filed his second motion to compel on March 25, 2026, Dkt. 50, to which Defendant responded on March 30, 2026, Dkt. 52 ("Opposition to Second Motion"). That same day, Plaintiff filed his third motion to compel, Dkt. 53, to which Defendant responded on April 2, 2026, Dkt. 54 ("Opposition to Third Motion"). The Court then granted Plaintiff's request for leave to file a reply for the latter two motions. Dkts. 55, 56. Plaintiff filed that reply on April 10, 2026. Dkt. 58.

On April 20, 2026, Defendant requested leave to file a sur-reply to Plaintiff's latest filing, Dkt. 59, and Plaintiff requested leave to attach an exhibit he had "inadvertently omitted" from his reply, Dkt. 60. The Court granted both requests the next day, while making clear "that going forward, *seriatim* resolution of discovery disputes that could otherwise be resolved in good faith without court action will not be tolerated." Dkt. 61; *see* Dkt. 62. Plaintiff filed the omitted exhibit on April 21, 2026, which is an article including Defendant's statement that it would continue to invest in "early in career talent" notwithstanding the layoffs to which Plaintiff was subject. Dkt. 63, Exh. A ("Article"). Defendant filed its sur-reply on April 24, 2026. Dkt. 64 ("Sur-Reply").

## II. Legal Standard

Under Federal Rule of Civil Procedure 26(b)(1), a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of admissible evidence should be discoverable." *Stollman v. Williams*, No. 20 Civ. 8937 (JPC), 2022 WL

4

1772552, at *4 (S.D.N.Y. June 1, 2022) (citation omitted).  But while "relevance, for purposes of discovery, is an extremely broad concept," it is "not unlimited."  *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2023 WL 3090950, at *3 (S.D.N.Y. Apr. 26, 2023) (internal quotation marks omitted).  And even when discovery is relevant, courts should still "consider[] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  A court thus "has the discretion to deny discovery requests if it determines that the burden or expense of the proposed discovery outweighs its likely benefit."  *Lockton Partners, LLC v. Stone Point Cap. LLC*, No. 25 Misc. 102 (JPC), 2025 WL 1699254, at *2 (S.D.N.Y. May 29, 2025) (internal quotation marks omitted); *see also GMO Gamecenter USA, Inc. v. Whinstone US, Inc.*, No. 22 Civ. 5974 (JPC), 2024 WL 4815671, at *4 (S.D.N.Y. Nov. 18, 2024) ("[C]ourts are encouraged to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." (internal quotation marks omitted)).

Motions to compel discovery are governed by a "two-step analytical framework."  *Johnson v. J. Walter Thompson U.S.A., LLC*, No. 16 Civ. 1805 (JPO) (JCF), 2017 WL 3055098, at *2 (S.D.N.Y. July 18, 2017).  "First, the moving party must demonstrate that the information sought is discoverable, including, among other things, that it is relevant."  *Id.*  And second, "once relevance has been shown, it is up to the responding party to justify curtailing discovery."  *Id.* (citation modified).

## III.  Discussion

Plaintiff seeks, across his multiple motions, five categories of documents and information: (1) comparator discovery about the other FWIAs nationwide and Ippolito's direct reports in the

New York Tri-State Region, First Motion at 1-3; Third Motion at 1-2; (2) discovery about the January 17, 2023 RIF as to the FWIAs and the New York Tri-State Region, Third Motion at 2-3; (3) discovery about the client pitch meetings from which Plaintiff was allegedly excluded and the client accounts on which Plaintiff worked, Second Motion at 1-3; (4) discovery about those who participated in investigating Plaintiff's claims and defenses, Second Motion at 3; and (5) discovery about Defendant's plans to invest in "early in career talent" after the RIF, Third Motion at 3. The Court takes each category in turn.

## A. Comparator Discovery

Plaintiff's First and Third Motions request various kinds of information about the other FWIAs, to whom he refers as his comparators. First Motion at 1-2 & nn. 1-2 (seeking, among other things, "documents concerning [Defendant's] treatment of FWIAs other than Plaintiff" and the identities of those who evaluated FWIAs); Third Motion at 1-2 (seeking information about the "self-sourced asset target" metric for FWIAs and "documents sufficient to show the ages, names, job levels/titles, and dates of employment of . . . FWIAs"). The Court concludes that Plaintiff is entitled to discovery for such potential comparators.

As the Second Circuit has explained, comparator evidence—"that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside the plaintiff's protected group—is a recognized method of raising an inference of discrimination." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 563 (2d Cir. 2024) (citation modified). And "[a]n employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Sasikumar v. Brooklyn Hosp. Ctr.*, No. 09 Civ. 5632 (ENV) (RML), 2011 WL 1642585, at *2 (E.D.N.Y. May 2, 2011) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000)). "Whether or not a plaintiff reports to the same supervisor as her comparator is an important factor in finding that [the] plaintiff

and the comparator are similarly situated." *Id.* (citation omitted).  But as the Second Circuit has clarified, while "the 'same decisionmaker' factor may often be an important one," "the lack of identical decisionmakers is not necessarily dispositive." *Radwan v. Manuel*, 55 F.4th 101, 135-37 (2d Cir. 2022) (emphasizing that there are "many factors that should be considered in determining whether a plaintiff's situation is sufficiently similar to a comparator").

In light of this standard, Defendant's objection—that FWIAs outside the New York Tri-State Region cannot be Plaintiff's comparators because they were not "overseen by Ippolito," Opposition to First Motion at 2; *accord* Opposition to Third Motion at 1-3—fails.  For one, it is at least arguable that the other FWIAs were subject to the same performance evaluation and discipline standards as Plaintiff: Plaintiff alleges, *and Defendant admits*, that after "the reporting structure changed" around 2017 or 2018 such that FWIAs reported directly to their respective Regional President, "[e]ach FWIA was still evaluated according to FWIA-specific goals set by the Head of Advice and was assessed relative to the performance of other FWIAs," and Plaintiff himself "continued to report to the Head of Advice on a dotted-line basis."  Compl. ¶¶ 17, 21; Answer ¶¶ 17, 21.  For another, even if it is true that the other FWIAs were directly overseen by Regional Presidents other than Ippolito, that is "not necessarily dispositive" for comparator status at the summary-judgment stage, let alone for the purposes of discovery.  *Radwan*, 55 F.4th at 132, 136 ("Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." (citation omitted)); *see Felder v. Warner Bros. Discovery, Inc.*, No. 23 Civ. 8487 (AT) (GS), 2025 WL 1718098, at *5 (S.D.N.Y. June 20, 2025) (explaining that the "standard for allowing discovery of potential comparators is more liberal" than "at the summary judgment stage").  To be sure, Defendant can argue that the other FWIAs are not comparators on the merits of Plaintiff's claims later on.  *See Qamar v. Sheridan Healthcare of Conn., P.C.*, No. 3:18 Civ. 1359 (JBA), 2019 WL 3712202, at *2 (D. Conn. Aug. 7, 2019) ("This issue of whether these

7

individuals are ultimately appropriate comparators may be addressed at the summary judgment stage." (collecting cases)).  But at this stage, Defendant cannot limit discovery into those employees.  *See Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950 (AT) (RWL), 2019 WL 3294145, at *2 (S.D.N.Y. June 7, 2019) ("Whether Plaintiffs will be able to meet th[e similarity] standard for any of the male employees for which they seek comparator materials remains to be seen. . . .  Denying all discovery of comparators, however, would prevent Plaintiffs from even attempting to make that showing.").

And while Defendant initially objected to comparator discovery of the other FWIAs "because the only relevant comparators to Plaintiff are those similarly overseen by Ippolito—those in the NY Tri-State Region," Opposition to First Motion at 2, when Plaintiff sought information relating to the self-sourced asset target metric and demographics of Ippolito's non-FWIA direct reports in the New York Tri-State Region, Third Motion at 1-2, Defendant objected on the grounds that those employees had "dissimilar titles" to Plaintiff, Opposition to Third Motion at 1-3.  But comparator status does not turn on job title alone.  *See, e.g.*, *DeAngelo v. Yellowbook Inc.*, No. 3:12-CV-520 (GWC), 2015 WL 588627, at *4 (D. Conn. Feb. 10, 2015) ("[C]omparators need not have the same job title."); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 434 (S.D.N.Y. 2014) (similar); *cf. Radwan*, 55 F.4th at 136 (explaining that there are "many factors that should be considered in determining whether a plaintiff's situation is sufficiently similar to a comparator"). So the Court likewise overrules this objection and holds that information about the non-FWIAs in the New York Tri-State Region who directly reported to Ippolito, including information relating to the self-sourced asset target metric, is discoverable.

Finally, the parties dispute whether Plaintiff is "entitled to any discovery about other FWIAs . . . except between 2022 and February 2023," which according to Defendant is "the only timeframe that any alleged discrimination occurred."  Opposition to First Motion at 3.  Plaintiff,

for his part, "seeks the comparator discovery at issue for the period 2019 to 2024, *i.e.*, from two years before []Ippolito became one of Plaintiff's supervisors and began making ageist comments (in 2021) to approximately two years after Plaintiff's termination." First Motion Reply at 3. The Court agrees with Plaintiff. Comparator evidence need not be limited to the exact time at which a plaintiff suffered the adverse employment action at issue. *Cf. Felder*, 2025 WL 1718098, at *7 (agreeing that "requests for comparator information . . . approximately two years before and after [the plaintiff's] termination" would lead to "potentially relevant" material). After all, "other allegations of discrimination, even if they do not independently constitute adverse employment actions, provide 'relevant background evidence' by shedding light on [the] Defendant's motivation" and can "thus bolster" a plaintiff's claim of discriminatory treatment. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002)); *see also Lewis v. N.Y.C. Police Dep't*, No. 09 Civ. 5472 (SLT), 2010 WL 11700300, at *3 (E.D.N.Y. Dec. 8, 2010) (explaining that a plaintiff "is entitled to discovery regarding the treatment of her 'comparators'" and that such information can also be "relevant background information"). So the Court overrules Defendant's objection as to the temporal scope of Plaintiff's request.

In all, the Court grants the First Motion's request for comparator discovery on Defendant's treatment of other FWIAs, the Third Motion's request for discovery into the self-sourced asset target metric as to FWIAs and Ippolito's direct reports in the New York Tri-State Region, and the Third Motion's request for demographic information of FWIAs and Ippolito's direct reports—and for the time periods specified in the motions.[2] *See* First Motion at 1-3; Third Motion at 1-2.

---

[2] Defendant expressly objected to the particular time period requested only in the First Motion. *See* Opposition to First Motion at 3.

**B.  RIF Discovery**

The Court reaches the same conclusion for Plaintiff's request to discover information about the January 17, 2023 RIF "as to[] (a) FWIAs nationwide[,] and (b) as to the [New York Tri-State Region]."  Third Motion at 2-3.  Defendant objects on the ground that "[t]he mere inclusion of other employees in numerous other areas of [Defendant's] business decided by other decision-makers as part of the same RIF as Plaintiff does not make them relevant to his claims."  Opposition to Third Motion at 3.  But as an initial matter, both Plaintiff and the other New York Tri-State Region employees were managed by Ippolito, the Regional President, so Defendant's objection is non-responsive to those employees.  *See* Compl. ¶ 21; Answer ¶ 21.  And even as to the FWIAs in other regions, the RIF-related discovery is appropriate.

The Second Circuit has found reversible error where trial courts have limited discovery in the way Defendant seeks.  For instance, the Second Circuit has determined that "the relevance" of a plaintiff's request for "all documents of or concerning" a company's specific RIF terminating the plaintiff was "plain," and even reached that conclusion for "previous and following reductions in force" at four of the company's local offices, including ones where the plaintiff had not worked at the time of her termination.  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 202, 204 (2d Cir. 2014); *see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84-85 (2d Cir. 1990).  That is because a request for information that "goes beyond the narrow confines of the . . . facility in which [the plaintiff] worked" "may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive."  *Hollander*, 895 F.2d at 84; *see also Moll*, 760 F.3d at 204 ("This same evidence may be used to detect retaliatory motives and unequal pay.").  So a "district court's refusal to compel" a defendant from "produc[ing] the requested documents deprive[s the plaintiff] of the opportunity to find evidence that might support her argument that

10

[the defendant's] reasons for firing her were pretextual, that she was discriminated [against], or that she was paid unequally." *Moll*, 760 F.3d at 204.

Of course, that some broader discovery "might be relevant to uncover a pattern which might help prove a plaintiff's disparate treatment claim" does not dispense with the requirement that "discovery must always remain proportional to the needs of the case." *Frazier v. Morgan Stanley & Co.*, No. 16 Civ. 804 (RJS), 2021 WL 2709250, at *3 (S.D.N.Y. July 1, 2021) (citation modified). Given that requirement, "discovery is often limited to a plaintiff's employment department or unit, especially where the allegations focus on a particular employment action in which decision-making was limited to that plaintiff's employment unit, as is often the case with disparate treatment claims." *Id.* (internal quotation marks omitted). But here, Defendant itself has admitted allegations that at the time of the RIF, FWIAs—including Plaintiff—were "still evaluated according to FWIA-specific goals set by the Head of Advice and w[ere] assessed relative to the performance of other FWIAs." Compl. ¶¶ 17, 21; Answer ¶¶ 17, 21. While Defendant tries to minimize this admission as a "red herring" and insists that "Ippolito made the decision to eliminate the FWIA position as to *his assigned region only*," Opposition to Third Motion at 2-3, Plaintiff need not "just take . . . defendant's word for it," and is "entitled to discover" RIF-related information for FWIAs and the New York Tri-State Region employees alike, *Qamar*, 2019 WL 3712202, at *2. So the Court grants the Third Motion's request for RIF-related discovery.

## C. Client Pitch Meeting and Client Account Discovery

Plaintiff seeks two categories of client-related documents: (1) those concerning the pitch meetings to which he was allegedly excluded by Defendant and (2) those concerning certain client relationships and account-management activities. Second Motion at 1-3.

As for pitch-meeting discovery, Defendant first relies on essentially the same objection as for the comparator and RIF discovery: that Ippolito only managed the NY FWIA and Plaintiff, so

11

he could not possibly have included in pitch meetings any younger FWIAs over those two, older employees.  Opposition to Second Motion at 1-2.  But for the reasons expressed above, *see supra* III.A-B, it may be relevant that Defendant did not exclude from pitch meetings younger FWIAs in other regions, or that Ippolito included younger non-FWIA employees in his.  This leads Defendant to a second objection: that it simply "never excluded Plaintiff or [the NY FWIA] from any pitch meetings," and that the burden is on Plaintiff to "identify the pitch meetings he purports are at issue."  Opposition to Second Motion at 2.  It should go without saying, however, that it is not Defendant's place to just declare such in discovery, especially when it would be straightforward enough to provide Plaintiff with information about (a) the pitch meetings that took place and (b) who was present at those meetings.  And after all, "parties are not required to prove their entitlement to discovery through first proffering evidence."  *Solomon v. Fordham Univ.*, No. 18 Civ. 4615 (ER), 2026 WL 861451, at \*10 (S.D.N.Y. Mar. 30, 2026); *see Mitchell v. Fishbein*, 227 F.R.D. 239, 249 (S.D.N.Y. 2005) (requiring that a plaintiff "provide the Court with proof of discrimination before he is entitled to seek discovery relating to his claim of discrimination" would "turn[] the purpose of discovery on its head").  So the Court grants the Second Motion's request for pitch-meeting discovery.

As for client relationships and account management, the Court also agrees that information on those matters is discoverable.  Defendant objects, arguing that the information sought "is not relevant to Plaintiff's claims or [Defendant's] defenses because [Defendant] did not terminate Plaintiff's employment based on his poor job performance."  Opposition to Second Motion at 2.  But as Plaintiff points out, such discovery "is necessary to show Plaintiff's excellent performance with respect to his allegations of disparate treatment," Second Motion at 2, since he "bears the initial burden of establishing a *prima facie* case of age discrimination by showing . . . that [he] was qualified for the position," *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir.

2021) (internal quotation marks omitted). "Once a *prima facie* case is established, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse action, which the plaintiff in turn may rebut by showing that the employer's determination was in fact the result of [age] discrimination." *Id.* (citation modified). And indeed, as Plaintiff also notes, Defendant's Answer "put Plaintiff's performance and client relationships at issue" by making the purportedly "pretextual" averment that "Plaintiff caused the loss [of] eighteen client relationships." Second Motion at 2 (citing Answer ¶ 32); *see* Answer ¶ 32 ("Defendant . . . avers that Plaintiff was responsible for Defendant's loss of a total of eighteen client relationships"). Defendant cryptically notes that it "reserves the right to request leave to amend its Answer to Plaintiff's Complaint to comport with the documents and information that have been produced," leaving it unclear whether it intends to strike that averment or build upon it. Opposition to Second Motion at 2 n.2. As it stands, though, discovery into those lost client relationships is relevant.

The parties dispute whether Defendant has produced all the documents in its possession bearing on the lost clients. *Compare* Second Motion at 3 n.3 (arguing that the "prior production . . . contain[s] only a sliver of the requested discovery"), *with* Opposition to Second Motion at 3 (claiming that Defendant "provided all relevant, discoverable information related to the client relationships that Plaintiff was associated with losing"). To the extent that Defendant has failed to produce all of the requested documents that it has in its possession, it is ordered to produce them. And if Defendant maintains its "representation that the documents [Plaintiff has] sought . . . do not exist," then its "failure to keep records . . . may itself constitute evidence" that its actions were "pretextual." *Moll*, 760 F.3d at 204; *see* Second Motion at 3 (asserting that Defendant "stated that it no longer has access to 'information related to Plaintiff's former client relationships' or 'other means to access the requested discovery' [concerning the alleged lost relationships] besides its prior production"). The Court thus grants the client-relationships aspect of the Second Motion

13

as well.

## D. Investigator Discovery

Plaintiff further seeks to compel Defendant "to identify the persons who participated in any investigation of the claims and defenses" in this case. Second Motion at 3 (internal quotation marks omitted). This request, Plaintiff explains, is bolstered by Defendant's initial disclosures, which "identified two non-attorneys as having knowledge of an investigation of Plaintiff's claims upon which [Defendant] may rely." *Id.* Defendant responds by invoking attorney-client privilege and the work-product doctrine, having disclaimed an intent "to rely on any investigation as an affirmative defense because no non-privileged information exists related to any investigation undertaken by [Defendant]" and explaining that the "mere participation by non-legal personnel in any privileged investigation does not allow Plaintiff to obtain information related to that investigation." Opposition to Second Motion at 3 (internal quotation marks omitted). Here, the Court agrees with Defendant.

As the Second Circuit has explained, "the work product privilege applies to preparation not only by lawyers but also by other types of party representatives including, for example, investigators seeking factual information." *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002) (citing Fed. R. Civ. P. 26(b)(3)); *accord ECDC Envt'l v. N.Y. Marine & Gen. Ins. Co.*, No. 96 Civ. 6033 (BSJ) (HBP), 1998 WL 614478, at *15-16 (S.D.N.Y. June 4, 1998) ("[T]he work-product doctrine is not limited to documents prepared by an attorney."). Because under Federal Rule of Civil Procedure 26(b)(3) a party usually "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative[,] including the other party's . . . agent," and Plaintiff has not shown that he "has substantial need for the materials to prepare [his] case and cannot, without undue hardship, obtain their substantial equivalent by other means," Fed. R. Civ. P. 26(b)(3)(A),

14

the Court denies his motion to compel the production of investigatory materials.

### E.  Public Statement Discovery

Lastly, Plaintiff has "requested documents regarding [Defendant's] plans to invest in 'early in career talent'" after the January 2023 RIF, arguing that "[t]hese documents are relevant to Plaintiff's allegations that [Defendant] publicly announced such plans and that these statements, coupled with the alleged disparate treatment and ageist comments, evidence a plan to get rid of older employees so that [Defendant] could bring on much younger ones." Third Motion at 3. The Complaint alleges that Defendant "announced" the RIF "in the press" and declared its plans to invest in "early-in-career talent," Compl. ¶ 39, a declaration that a submitted press article attributes to a "statement" by Defendant, *see* Article.  Defendant objects that it need not produce "communications with news publications regarding the RIF" when "it did not speak with any about Plaintiff," Opposition to Third Motion at 3 (internal quotation marks omitted), and further seems to deny having made a public statement about investing in "early in career" talent, *see* Sur-Reply at 1-2.  Neither objection persuades.

As for Defendant's first objection, "[w]here press statements are claimed to have been made which arguably relate to the subject of a lawsuit"—here, the RIF leading to Plaintiff's termination—"information about such statements may be admissible or lead to admissible evidence and hence are discoverable." *Chambers v. Cap. Cities/ABC*, 159 F.R.D. 429, 430 (S.D.N.Y. 1995) (granting the plaintiff's request for "information about alleged press statements by executives of defendants or related entities which plaintiff believes tend to show age discrimination").  Plaintiff alleges that his termination in the RIF was discriminatory such that information about the RIF is discoverable, *see* Compl. ¶¶ 33-39; *supra* III.B, so Defendant's public statements about that RIF are discoverable whether or not they specifically referenced Plaintiff.

On the second objection, "[p]ress statements are obviously not burdensome to verify or

15

refute," and a "plaintiff is entitled to obtain information concerning the accuracy or inaccuracy of quotations in the press about [the defendant's] employment policies." *Chambers*, 159 F.R.D. at 430-31. Whether Defendant in fact made any public statements about investing in early-in-career talent is, of course, the point of the requested discovery. And while the Court appreciates Defendant's concern about identifying statements made by unidentified individuals, *see* Opposition to Third Motion at 3-4, that concern is addressed by Defendant needing only to produce documents in its "possession, custody, or control," Fed. R. Civ. P. 34(a)(1). The Court thus grants the Third Motion's request about Defendant's public statements.

## IV. Conclusion

For the above reasons, Plaintiff's first and third motions to compel are granted in full; his second motion is granted in part and denied in part. The Clerk of Court is respectfully directed to close Docket Numbers 40, 50, and 53.

SO ORDERED.

Dated: May 6, 2026
New York, New York

_____
JOHN P. CRONAN
United States District Judge

16